RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0015p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SUSAN STRICKER, KEVIN STRICKER, ANDREW
STRICKER, JACQUELINE STRICKER,
        _Plaintiffs-Appellants_,

     _v._

TOWNSHIP OF CAMBRIDGE, et al.,
        _Defendants-Appellees_.

No. 11-1998

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-14424—Nancy G. Edmunds, District Judge.

Argued: October 11, 2012

Decided and Filed: January 14, 2013

Before: KEITH, MARTIN, and ROGERS, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** J. Michael Southerland, J. MICHAEL SOUTHERLAND, P.C., Plymouth, Michigan for Appellants. G. Gus Morris, McGRAW MORRIS P.C., Troy, Michigan, Cynthia L. Reach, REACH LAW FIRM, Ann Arbor, Michigan, Joseph T. Froehlich, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** J. Michael Southerland, J. MICHAEL SOUTHERLAND, P.C., Plymouth, Michigan for Appellants. G. Gus Morris, D. Randall Gilmer, McGRAW MORRIS P.C., Troy, Michigan, Cynthia L. Reach, REACH LAW FIRM, Ann Arbor, Michigan, Joseph T. Froehlich, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

_____

## OPINION

_____

    DAMON J. KEITH, Circuit Judge. Various members of the Stricker family appeal a grant of summary judgment for Defendants on their § 1983 claims. Local and

state police officers responded to a 911 call from Susan Stricker requesting help for her son, Andrew, who was suffering from an apparent drug overdose. Consistent with policy requirements, police officers responded to the call to secure the premises for EMS. When officers arrived at the scene, Susan and her husband, Kevin Stricker, refused the officers entry into the house without a warrant. After unsuccessfully trying to convince the Strickers to let the officers in or to have Andrew come out, the officers forced their way in, conducted a search of the house, and placed Andrew's parents in handcuffs while EMS administered care to Andrew.

In December 2010, various members of the Stricker family sued various police officers and municipal entities under 42 U.S.C. § 1983, alleging Fourth Amendment violations in connection with the police's response to the 911 call. Defendants consisted of the Township of Cambridge, Lenawee County, and the following persons in their official and individual capacities: Greg Hunt, sergeant of the Cambridge Township Police Department; Larry Wibbler, police chief of the Cambridge Township Police Department; Christopher Kourt and Christopher VanDyke, deputy sheriffs of the Lenawee County Sheriff's Department; Jack Welch, sheriff of the Lenawee County Sheriff's Department; Frank Riley, assistant prosecutor of Lenawee County; Amy McMullen, trooper of the Michigan State Police; Michelle Stuck, sergeant of the Michigan State Police; and Peter Munoz, director of the Michigan State Police (collectively, "State Defendants"). The district court granted summary judgment for State Defendants, finding that exigent circumstances justified all of the police's actions. On appeal, the Strickers assert that the district court erred in dismissing their claims, primarily arguing that reasonable minds could differ as to the existence of exigent circumstances. Upon due consideration, we **AFFIRM** the judgment of the district court.

## **BACKGROUND**

Although the parties dispute some of the facts, the disputed facts are presented as characterized by the Strickers because on summary judgment the court views all of

the facts and draws all reasonable inferences in favor of the non-moving party. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

**A.        The 911 Call**

On December 22, 2008, at 7:49 p.m., Susan Stricker called 911 from her residence to report that her twenty-year-old son, Andrew Stricker, had "overdosed on some kind of drugs" and requested EMS assistance at her home in Onsted, Michigan. R.76, Ex. I at 1. When asked if she knew what drugs her son had taken, she admitted that she had "no clue." *Id.* She related that he was "falling down, . . . losing consciousness, [was] not in touch with reality, [could not] talk to [her or tell her] his name or what he [was] doing, and he just [could not] stand up straight and he [could not] move." *Id.*

**B.        Arrival of Sergeant Hunt**

Although Cambridge Township Fire and Rescue personnel were the first to arrive at the Stricker home, they waited at the end of the driveway for police to secure the scene per township policy. The 911 dispatcher sent Sergeant Greg Hunt of the Cambridge Police Department ("Sgt. Hunt") to secure the premises. While en route, Sgt. Hunt informed dispatch that he had previously arrested two heroin addicts who lived at the address provided—i.e., Andrew and his brother, William Stricker.

Around 8:00 p.m., Sgt. Hunt arrived at the Stricker home, knocked, and was allowed in by Kevin Stricker, Andrew's father and Susan's husband. Upon entry, Sgt. Hunt asked Kevin how Andrew was, and Kevin answered that Andrew was not doing well. Sgt. Hunt observed Andrew sitting in a chair at a table and noted that he looked very pale. Before Sgt. Hunt could secure the premises and invite the paramedics into the home, Susan entered the room and asked him if he was a police officer. When he answered affirmatively, Susan asked that he leave the premises. She elaborated that she did not call the police and that she would call the state police if he did not leave immediately. Sgt. Hunt explained that, when 911 is called, rescue personnel have a duty to check on the welfare of the reported victim, but will not enter a home without a police

officer present for their safety. Susan told Sgt. Hunt that she was a registered nurse, that she had examined Andrew and he was fine, and that there was no longer any need for EMS. Sgt. Hunt then left the Stricker home and waited at the end of their driveway with medical personnel.

## C.      Arrival of Deputy VanDyke

Deputy sheriff Christopher VanDyke of the Lenawee County Sheriff's Department ("Deputy VanDyke") was also sent to the Stricker home. Dispatch told him that he was to assist on a reported drug overdose and that Sgt. Hunt was going to the residence to secure the scene until he arrived. While en route, Deputy VanDyke heard Sgt. Hunt tell dispatch that the Strickers had ejected him from their property. When Deputy VanDyke arrived, Sgt. Hunt briefed him on his encounter with the Strickers and his observation of Andrew. They also discussed arresting Andrew for a bond violation. Deputy VanDyke and Sgt. Hunt then pounded on the Strickers' front door and shined flashlights through their windows, demanding that the door be opened or that Andrew be sent outside to be checked out.

Through the door, Susan and Kevin took turns reiterating that Andrew was fine, that the officers would not get into the house without a warrant, and that they were going to call the officers' supervisors to get them to stop pounding on their front door. Deputy VanDyke again explained that the township had a duty to check on a reported victim of a 911 call. The Strickers continued to insist that the police get a warrant. Susan declared that she wanted to talk to the Michigan State Police and that she would file charges against the officers for being on her property. At that point, Deputy VanDyke and Sgt. Hunt left the porch and waited for state police.

At about 8:19 p.m., Susan called the Lenawee County Sheriff's Department and requested that a supervisor be sent to her home to make the two officers stop banging on her front door. Kevin called 911 and reported Susan's earlier call as a false alarm and asked that the request for help be cancelled. The dispatch operator reiterated the township's duty to check the welfare of a reported victim.

**D.     Arrival of State Trooper McMullen**

State trooper Amy McMullen of the Michigan State Police ("Trooper McMullen") was also dispatched to the Stricker home on a possible heroin overdose and in response to Susan's specific request for state police. While en route, dispatch told her that the same woman who had called 911 from her home to report that her son was overdosing on drugs was now refusing to let officers into the house. Upon her arrival, Deputy VanDyke and Sgt. Hunt told Trooper McMullen that Hunt had previously arrested Andrew on heroin-related charges.

All three officers approached the Strickers' front door, where McMullen announced, "State Police, Trooper McMullen, open the door." She faintly heard a male voice respond, "Go away, we don't need any help." R. 76, Ex. E at 2; Ex. A ¶ 15. By this time, the lights were off in the Stricker household and the home was completely dark, making it difficult for the officers to see into the home or identify how many people were inside. Again, Trooper McMullen knocked, yelling for the Strickers to "send [Andrew] outside to be seen or . . . they would break the door in" to make sure that Andrew had not overdosed on drugs. R. 76, Ex. A at ¶ 17. Again, she faintly heard a male voice through the front door declare that the officers would have to get a warrant because Andrew was not coming out. Kevin then showed his face through a large front-facing window. He reiterated that the officers could not come in, that Andrew was fine, and that Andrew would not come out. Trooper McMullen asked Kevin to at least allow Andrew to come outside to the porch so that medical personnel could check him. The Strickers, again, refused. Because neither dispatch nor the officers could ascertain how many people were inside the house, additional police were sent to the Stricker home. Among them was deputy sheriff Christopher Kourt of the Lenawee County Sheriff's Department ("Deputy Kourt").

**E.    Officers' View of Andrew and the Decision to Force Entry**

A few minutes later, Kevin stood at the same large front-facing window with a young man that Sgt. Hunt confirmed was Andrew. Through the window, Trooper McMullen asked Andrew to come outside to the porch so he could be checked by medical personnel, but Andrew refused to do so, saying that he was fine. According to the officers, Andrew appeared very pale. He could not focus on McMullen's face even though their faces were only a few inches apart, and his eyelids looked very heavy. He did not appear alert and propped himself up by placing his hands on the window.

From the Strickers' front porch, Trooper McMullen contacted Sergeant Michelle Stuck ("Sgt. Stuck"), the on-call sergeant at the Michigan State Police Department, and updated her on the situation. Sgt. Stuck recommended that the officers force their way inside to help Andrew. According to an incident report, Sgt. Stuck considered the following in making her recommendation: Sgt. Hunt's prior contact with Andrew as a heroin user; the 911 call reporting a drug overdose; and the refusals by Susan, Kevin, and Andrew, despite Susan's 911 call, to allow Andrew to obtain medical attention. Trooper McMullen then contacted Frank Riley, an assistant prosecutor for Lenawee County, for his recommendation. Assistant Prosecutor Riley agreed that a forced entry was warranted.

**F.    Forced Entry, Search, and Arrest of the Strickers**

At about 8:30 p.m., Sgt. Hunt, Deputy VanDyke, Trooper McMullen, and Deputy Kourt forced open the front door. Trooper McMullen was the first to enter and did so with her firearm drawn. She observed Kevin descending the stairs just inside the front door. Pointing her gun at his head, McMullen ordered him to the ground, placed him in handcuffs, patted him down for weapons, and then moved on with Deputy VanDyke. Sgt. Hunt stayed with Kevin to stand guard. Kevin was left face down on the floor for about thirty minutes.

After searching the ground floor, Deputy Kourt and Sgt. Hunt went upstairs to search the second floor while Trooper McMullen and Deputy VanDyke went to the

basement, where they found Andrew hiding.  VanDyke placed Andrew in handcuffs and patted him for weapons.  McMullen opened a closed bedroom door that Andrew identified as belonging to his brother, William Stricker.  McMullen and VanDyke took Andrew outside to be treated by EMS.

Meanwhile, Sgt. Hunt and Deputy Kourt found Susan and her fourteen-year-old daughter, Jacqueline Stricker, on the second floor.  Deputy Kourt kicked in Susan's locked bedroom door, pointed a taser gun at her, "put a forceful pressure hold" on Susan's neck to "force her to stand," checked her for weapons, and "roughly" handcuffed her.  R. 76, Ex. A ¶ 23–27; Ex. E at 3.  Deputy VanDyke kicked in Jacqueline's bedroom door, ordered her to the floor, and then moved her to Susan's bedroom.  The officers ordered the pair downstairs and handcuffed Susan to a chair.  The officers went on to search dressers, kitchen cabinets, and drawers, along with closets and the bedroom of Susan's other son.  Trooper McMullen asked Jacqueline about the presence and use of illegal drugs in the Stricker home.

Sgt. Stuck arrived after the forced entry and search were completed.  Trooper McMullen then asked the dispatcher to contact the on-call magistrate about revoking a bond that Andrew had apparently violated.  The dispatcher did so and told Trooper McMullen that the magistrate would not revoke the bond, but had suggested that Trooper McMullen call the on-call prosecutor for further assistance on a possible drug use charge.  Trooper McMullen again phoned Assistant Prosecutor Riley, who was on call, at his home around 10:00 p.m.  She briefed him on the situation, and he authorized her to take Andrew into custody for "use."  R. 76, Ex. F at 1.  Riley also conveyed that he was "satisfied" with a decision to charge Kevin and Susan with resisting and obstructing a police officer.  *Id*.

According to the medical report of paramedic Thomas Brown, Andrew reported that he had taken a mixture of Xanax—a brand of anxiety pill—and heroin.  Paramedic Brown also observed that Andrew's pupils were pinpoint and that he had an unusual heart rate, confirming Andrew's report.  He gave Andrew a dose Narcon, a medicine that counteracts the effects of narcotics, and told Trooper McMullen that Andrew needed to

be taken to the hospital as soon as possible.  The ambulance left a few minutes later for Bixby Medical Center.  Sgt. Hunt followed in order to arrest Andrew for heroin use as soon as he was released.

In the meantime, Trooper McMullen and Deputy VanDyke escorted Susan and Kevin to the Lenawee County Jail.  Kevin was arrested for resisting and obstructing a police officer in violation of Michigan Compiled Laws § 750.81d(1).  Susan was arrested for the same charge and also for filing a false report in violation of Michigan Compiled Laws § 750.309.  Andrew was arrested for substance use in violation of Michigan Compiled Laws § 333.7404.

## G.        Procedural Background

Plaintiffs-Appellants consist of Susan, Kevin, and Andrew Stricker (collectively, "the Strickers").[1]  In December 2010, the Strickers filed a complaint under 42 U.S.C. § 1983 alleging: illegal entry into their home, unreasonable search, unreasonable seizure and arrest, excessive force, malicious prosecution, municipal liability, and conspiracy to violate the Fourth Amendment.  In March 2011, State Defendants filed motions to dismiss and for summary judgment.  After a hearing,  the district court entered an order granting State Defendants' summary judgment motions on August 1, 2011.  On August 26, 2011, Plaintiffs timely appealed.

## STANDARD OF REVIEW

We  review an order granting summary judgment *de novo*.  *Tysinger*, 463 F.3d at 572.  Under Federal Rule of Civil Procedure 56(a), summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This requires us to view the evidence and draw all reasonable inferences in favor of the non-moving

---

[1]Jacqueline Stricker does not have the legal capacity to sue because she is a minor and no evidence was ever submitted to show that next friend status was obtained.  Accordingly, she is not a party to this action even though the Strickers registered her as a party on the docket.  *See Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) ("Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted.").

party. *Tysinger*, 463 F.3d at 572. A genuine dispute concerns evidence "upon which a reasonable jury could return a verdict in favor of the non-moving party." *Id.* A factual dispute is material only if it could affect the outcome of the suit under the governing law. *Id.*

## DISCUSSION

The Strickers contest the entry of summary judgment for the State Defendants on all claims. We address each claim in turn: illegal entry, search, and seizure; excessive force; conspiracy to violate the Fourth Amendment; malicious prosecution; and municipal liability.

## I.        Warrantless Entry Under the Fourth Amendment

The Fourth Amendment, which applies to the states through incorporation by the Fourteenth Amendment, protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. amend. IV. The home is afforded the greatest amount of protection. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980); s*ee also Groh v. Ramirez*, 540 U.S. 551, 559 (2004). Nevertheless, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia,* 528 U.S. 11, 13 (1999) (per curiam)).

### A.        Medical Emergencies Under the Exigent Circumstances Exception

One "well-recognized exception applies when the 'exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). A determination of exigent circumstances is typically a question for the jury. However, the issue may be decided as a matter of law when a fact finder could only reach one conclusion on the undisputed facts. *Ewolski v. City of Brunswick,* 287 F.3d 492, 501

(6th Cir. 2002). We must judge the reasonableness of officer action objectively; it does not matter "whether the officers enter[]. . . to arrest . . . and gather evidence" so long as "the circumstances, viewed *objectively*, justify the action." *Brigham City*, 547 U.S. at 404–405 (emphasis in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)); s*ee also King*, 131 S. Ct. at 1859.

Circumstances in which it is objectively reasonable to believe a medical emergency exists fit within the exigent circumstances exception. In *Brigham City v. Stuart*, 547 U.S. 398 (2006), the Supreme Court held that an exigency existed where police officers came to a house in response to a noise complaint from neighbors and the officers saw a teen strike an adult, sending the adult to the sink spitting blood. *Id*. at 406. The Court explained that the "officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id*. The Court held that an exigency arises when there is a "need to protect or preserve life or avoid serious injury" and that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. at 403.

In *Michigan v. Fisher*, 558 U.S. 45, 130 S. Ct. 546 (2009) (per curiam), the Court also held an exigency existed. Police officers came to a house in response to a 911 call from neighbors reporting a disturbance. In addition to broken windows and other evidence of violence, the police saw the defendant throwing things and screaming. *Id*. at 547. The Supreme Court held that "[i]t would be objectively reasonable to believe that [the defendant's] projectiles might have a human target (perhaps a spouse or a child), or that [the defendant] would hurt himself in the course of his rage." *Id*. at 549.

Precedent from this circuit further illuminates what constitutes a medical emergency fitting within the exigent circumstances exception. In *Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003), officers responded to a 911 call from a resident reporting a "cutting or stabbing." *Id*. at 249. Although EMS had already arrived, the officers had to secure the scene before EMS would enter the residence. The officers knocked, and when the defendant answered the door, they saw that his hand was

bleeding profusely. The defendant rebuffed the police, however, exclaiming that he had called for the paramedics, not the police. The officers entered the house anyway. *Id*. We held that the combination of the 911 call, the uncertain nature of the emergency, and the need to safeguard EMS while tending to the defendant made for exigent circumstances. *Id*. at 254. We reasoned that the 911 call was made at the defendant's behest, "solicit[ing] a response from an emergency team"; and while we declined to consider the call itself "consent justifying the search," we held that "it clearly weighs in favor of finding that plaintiffs' expectation of privacy in their home was diminished." *Id*. at 254–55. We reasoned that the defendant "was obviously seriously injured" and held that exigent circumstances exist where "real immediate and serious consequences will certainly occur if the police officer postpones action to obtain a warrant." *Id*. at 253, 255 (internal quotation marks omitted).

In *Johnson v. City of Memphis*, 617 F.3d 864 (6th Cir. 2010), we held that the combination of a hang call—a 911 call that was immediately disconnected, an unanswered return call, and an open door with no response from within the residence created exigent circumstances. *Id*. at 869. We also elaborated on the significance of a 911 call. We explained:

> The whole point of the 911 system is to provide people in need of emergency assistance an expeditious way to request it. Indeed, in many communities, the use of 911 for any purpose other than to report an emergency or to request emergency assistance is at least a misdemeanor offense. . . . Because a 911 call is by its nature an appeal for help in an emergency, the emergency aid exception best fits the attitude of police responding to a 911 call under the circumstances present here. Given the information he had, [the officer] had an objectively reasonable basis for believing that a person within the house was in need of immediate aid.

*Id*. at 870 (internal citations and quotation marks omitted).

Taken together, this precedent shows that a 911 call on behalf of an injured party and affirmative evidence that someone may be or could be hurt can each contribute substantially to an objectively reasonable belief in the existence of a medical emergency. With this precedent in mind, the facts as presented by the Strickers show that it was

objectively reasonable to believe that Andrew Stricker was "in need of immediate aid" and that "real immediate and serious consequences [would] certainly occur if the police officer[s] postpone[d] action to obtain a warrant." *Fisher*, 130 S. Ct. at 548; *Thacker*, 328 F.3d at 253 (internal quotation marks omitted).

## B.     Analysis

Viewed in the light most favorable to the Strickers, the combination of the 911 call soliciting help for a drug overdose, the police's independent knowledge and observations confirming the reported overdose, and the Strickers' attempts to prohibit access to Andrew despite their initial call for help made it objectively reasonable for the officers to believe that Andrew was overdosing on drugs and was in need of immediate medical evaluation and attention.[2]

Just as in *Thacker* and *Johnson*, State Defendants responded to a 911 call placed by Susan "solicit[ing] a response from an emergency team."[3] *Thacker*, 328 F.3d at 254. Susan provided an incomplete description of the emergency—her son had "overdosed on some kind of drugs." He was "falling down . . . losing consciousness [and] not in touch with reality, he [could not] talk to [Susan or tell her] his name or what he [was] doing, and he just [could not] stand up straight and he [could not] move." But she had "no clue" as to what the drug was. R. 76, Ex. I at 1. If a 911 call adds some contribution to a finding of exigent circumstances because it is "by its nature an appeal for help in an emergency," then surely a 911 call made by a resident affirmatively requesting emergency assistance at her home and providing some description of the nature of the

---

[2]The Strickers repeatedly claim that there were no exigent circumstances because the officers demonstrated an ulterior motive through their failed attempt to obtain a warrant for an alleged bond violation by Andrew. However, such a discussion leads to a subjective analysis—a standard of review that the Supreme Court has repeatedly, and recently, disavowed. *See Kentucky v. King*, 131 S. Ct. 1849, 1859 (2011) ("'Our cases have repeatedly rejected' a subjective approach, asking only whether 'the circumstances, viewed *objectively*, justify the action.'") (quoting *Brigham*, 547 U.S. at 404) (emphasis in original).

[3]The Strickers assert that it is error to rely on law decided after December 2008, when the events at issue happened, and that precedential caselaw from December 2008 does not support an objective belief in exigent circumstances. This argument is unpersuasive, because only two of the four aforementioned cases were decided after the events in controversy. Both *Brigham* (2006) and *Thacker* (2003) were controlling precedent in December 2008 and both are instructive to determining whether exigent circumstances existed here.

emergency contributes to an "objectively reasonable basis for believing that a person within the house was in need of immediate aid." *See Johnson*, 617 F.3d at 870 (internal quotation marks omitted).

The Strickers' attempts to rebuff the police, cancel their EMS request, and insist that Andrew had already been examined by a medical expert (i.e., Susan as an RN) diminishes in relevance in the face of facts independent of the 911 call that Andrew was "obviously seriously injured." *See Thacker*, 328 F.3d at 255. Sgt. Hunt made an initial observation that Andrew was pale,[4] Kevin told Sgt. Hunt that Andrew was not well, Andrew was known to be a heroin user, and the officers had observed that Andrew could not focus, did not appear alert, and was unable to stand on his own. All of these facts served to confirm the reported drug overdose, not only for the officers on the scene, but for the officers' superiors, like Sgt. Stuck. *See Thacker*, 328 F.3d at 254–55 (holding that defendant's efforts to rebuff police attempts to enter his house did not negate an objective belief in a medical emergency where police observed defendant's hand bleeding profusely, confirming the report of a cutting or stabbing). It is clear that it was objectively reasonable for the officers to believe a medical exigency existed when they had affirmative evidence that someone in the home needed immediate aid. *See Fisher*, 130 S. Ct. at 549 (holding that it was objectively reasonable to believe that a medical exigency existed where defendant was seen screaming and throwing things because defendant's projectiles "might have a human target").

It is significant that the Strickers not only refused the police entry into their home, but also barred all access to Andrew by refusing requests for him to leave the house to be treated. *See Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (holding that exigent circumstances existed where officer had an objectively reasonable belief that residents "were at a high risk for further drug-related injuries" due to complainant's efforts "to keep [the officer] out" and her "apparent concealment of information regarding [an] overdose"). Though the Strickers may have been understandably hesitant

---

[4]Even assuming that Sgt. Hunt's initial observation counted as a "welfare check," as the Strickers insist it did, that welfare check contributed to the conclusion that Andrew was in need of further medical evaluation and assistance.

about the officers coming into their house, they had the option to send Andrew out to be treated by EMS.[5]  They declined to do so.

## II.      The Need for, Duration, and Scope of the Search

The Strickers challenge the need for the search of their home.  They also argue that the scope and duration of the search exceeded the exigency, to the extent there was one, because the search only needed to extend to the point of finding Andrew.  The district court found that the search was justified to locate Andrew so as to ascertain his well-being and get him to EMS.  Additionally, the district court found that a search of the entire house was justified as a protective sweep, and as a search for clues as to the kind and quantity of drugs Andrew had ingested, in order to help the paramedics.  For the following reasons, we agree that the district court's ruling was consistent with Sixth Circuit precedent.

### A.      The Need for the Search

As demonstrated above, State Defendants had an objectively reasonable belief that Andrew was in need of immediate medical attention.  Upon making the forced entry into the house, Andrew was not within view.  Instead, the officers only observed Kevin descending the stairs just inside the front door.  However, they knew that they were looking for Andrew and knew what he looked like since they had observed him through the window.  Thus, the officers were justified in conducting the search to locate Andrew.  *See Johnson*, 617 F.3d at 864, 869–70 (holding that police are "justified in entering the home to sweep for a person in need of immediate assistance under the emergency aid exception").

Additionally, the need to safeguard EMS, themselves, and others on the Stricker property made it objectively reasonable for the officers to conduct a protective sweep of the Stricker home to secure the premises so the paramedics could safely treat Andrew.

---

[5]Because the Strickers did not contest the constitutionality of the Township of Cambridge's policy requiring residents to grant police access to their homes when they request EMS assistance, we do not comment regarding the constitutionality of the policy.

The Strickers repeatedly inhibited EMS' access to Andrew, giving State Defendants sufficient cause to think that Plaintiffs may have taken further action. *See Thacker*, 328 F.3d 244, 253 (6th Cir. 2003) (upholding as objectively reasonable officers' entry and subsequent protective sweep to determine "whether anything or anyone in plaintiffs' home posed a risk of danger either to themselves or to the paramedics who sought to enter the home to attend to the injured, or, alternatively, to someone inside the home").

### B.     The Duration and Scope of the Search

The Strickers assert that the officers "turned the house upside down searching closed dresser drawers and kitchen drawers and cabinets" after Andrew had been taken to EMS and Susan and Kevin had been handcuffed. Appellant Br. at 10. They further claim that Trooper McMullen "question[ed] the minor daughter on drug use in the home." *Id*. The scope of the search under these facts makes the issue a close one. Yet, because the factual record demonstrates that it was objectively reasonable for the officers to believe that Andrew was suffering from a drug overdose and that the Strickers attempted to hide the drug overdose from the police, a search around the bedrooms and even into the drawers is consistent with a search for clues as to what Andrew ingested, in order to aid EMS in its treatment of Andrew. *See McKenna v. Edgell*, 617 F.3d 432, 444 (6th Cir. 2010), *cert. denied*, 131 S. Ct. 1790 (2011) (observing that more thorough searches "[u]nder ordinary circumstances" are "reasonably . . . consistent with a quest for clues about [a person's] medical condition, information that would be valuable to his treatment"); *Brooks*, 577 F.3d at 708 (upholding district court's finding that forced entry and subsequent search of a residential building was objectively reasonable under the exigent circumstances exception because the facts showed "that a person had overdosed on drugs," that "an attempt was made to conceal that fact from police," and that the complainant "had twice barred entry" to the police). Based on these facts, the search was objectively reasonable.

## III.    Arrest and Seizure

The Strickers maintain that they were unlawfully seized for passive refusal to comply with unlawful commands.  We disagree.

Under the United States Constitution, an arrest must be supported by probable cause.  *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) ("[I]t is well established that any arrest without probable cause violates the Fourth Amendment."); *see also Baker v. McCollan*, 443 U.S. 137, 142–43 (1979).  For probable cause to arrest to exist, the "facts and circumstances within the officer's knowledge" must be "sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing or is about to commit an offense."  *Crockett*, 316 F.3d at 580 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  The facts and circumstances examined are confined to those "within an officer's knowledge at the time of an arrest."  *Id.* (quoting *Estate of Deitrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999)).

### A.    Michigan Compiled Laws § 750.81d(1)

There was probable cause that Kevin and Susan had resisted and obstructed the officers in violation of Michigan Compiled Laws § 750.81d(1) due to their failure to follow officer commands to either allow them entry to secure the scene for EMS or have Andrew leave the house for treatment.  The statute reads in pertinent part that "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony."  Mich. Comp. Laws § 750.81d(1).  The statute goes on to define "obstruct" to include "knowing failure to comply with a lawful command."  Mich. Comp. Laws § 750.81d(7)(a).  "Person" includes "[a] police officer of this state or of a political subdivision of this state," and "[a] sheriff or deputy sheriff."  Mich. Comp. Laws § 750.81d(7)(b)(i) & (v).  According to a recent Michigan Supreme Court decision, the statute does not abrogate the right to resist an unlawful command, in contrast to the characterization given by the district court and State Defendants.  *See People v. Moreno*, 814 N.W.2d 624, 629 (Mich. 2012) ("We hold that MCL 750.81d did

not abrogate the right to resist unlawful police conduct."). Nevertheless, here, there were sufficient facts for the officers to reasonably believe that Kevin and Susan had knowingly failed to comply with their lawful commands.

### B.     Analysis

The Strickers do not dispute that their failure to comply with officer demands was knowing. They only argue that the officers' demands were unlawful. As agents of the township, the officers had a duty to assure themselves of the welfare of the victim that the Strickers themselves had reported to the township. The officers' demands to be permitted entry into the house or, in the alternative, to have Andrew leave the house, were lawful according to the exigent circumstances exception. The Strickers do not dispute that they called 911 and that they refused to open the door or to send Andrew outside in response to the officers' commands. Therefore, the officers were objectively reasonable in believing that Kevin and Susan failed to comply with their lawful commands, thereby obstructing them in the performance of their duties.[6]

## IV.    Excessive Force

The Strickers each allege excessive-force claims. Specifically, Kevin alleges excessive force by Trooper McMullen for pointing a gun at his temple while handcuffing him and forcing him to lie face down on the floor for thirty minutes. Susan alleges excessive force by Deputy Kourt for pointing a taser gun at her, roughly handcuffing her, and putting a pressure hold on her neck. Andrew alleges excessive force by Deputy VanDyke for handcuffing him. We agree with the district court that the force was not excessive given the Plaintiffs' attempts to evade and flee arrest.

---

[6] Andrew's unreasonable seizure claim also alleges a lack of probable cause for violating Michigan Compiled Laws § 750.81d(1). This was not Andrew's crime of arrest, which was for substance use in violation of Michigan Compiled Laws § 333.7404. There was probable cause that Andrew violated this statute for the same reasons it was objectively reasonable to believe he was suffering from a drug overdose.

### A.    Excessive Force Standard

An excessive force inquiry turns on "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). If all material facts are undisputed, the reasonableness of officer conduct in an excessive-force claim is a question of law that a court may decide. *Scott v. Harris,* 550 U.S. 372, 381 n.8 (2007). In general, a plaintiff need not demonstrate a physical injury. Instead, "[i]n determining whether there has been a violation of the Fourth Amendment, we consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010) (internal quotation marks omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted). Factors used to gauge whether there has been excessive force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [an arrestee] is actively resisting arrest or attempting to evade arrest by flight." *Id*.

With regard to handcuffing specifically, our circuit has developed a more defined standard. To survive summary judgment, a plaintiff must create a genuine issue of material fact that: "(1) he or she complained that the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Miller*, 606 F.3d at 252.

### B.    Analysis

With regard to the handcuffing claims, nothing in the briefs or the submitted evidence alleges that any of the Strickers complained that their handcuffs were too tight, that State Defendants ignored the complaints, or that they suffered any injury as a result. Therefore, these claims fail.

For the remaining claims, no reasonable jury would find that State Defendants subjected any of the Strickers to gratuitous violence. The Strickers admit that they repeatedly disobeyed lawful officer commands. Upon entry, Trooper McMullen saw Kevin descending the stairs just inside the front door. Since Kevin was headed away from the point of the officers' entry, it was objectively reasonable for her to believe that he was attempting to flee from the police. Therefore, her actions of pointing a gun at him, handcuffing him, and forcing him to stay on the floor for thirty minutes were not gratuitously violent efforts to restrain him.

The same can be said about Susan. Although she spent most of the encounter speaking to the officers through the front door, she was found on the second floor in a locked room when officers entered the home. Accordingly, pointing a taser gun at her and using a pressure hold to get her to stand was not a gratuitously violent way to restrain her. *See Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) (holding that use of pepper spray was objectively reasonable where plaintiff had run to hide in her bedroom closet after ignoring officer requests to answer her front door). Forcing Kevin and Susan to remain on the ground floor until Andrew was transported to the hospital was also objectively reasonable given their earlier attempts to prevent medical personnel's access to Andrew and their attempts to evade arrest by flight.

## V.    Conspiracy, Prosecutorial, and Municipal Claims

Finally, the Strickers argue that the district court incorrectly dismissed their claims for conspiracy, malicious prosecution, and municipal liability. We disagree.

Because there was no Fourth Amendment violation, there is no conspiracy claim based on State Defendants' acts. *See Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir. 2009) (holding that a plaintiff cannot succeed on a conspiracy claim where "there was no underlying constitutional violation that injured her"). Therefore, dismissal was proper.

While we do recognize a "§ 1983 claim for malicious prosecution arising under the Fourth Amendment," the "contours of such a claim remain uncertain." *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007). "What is certain . . . is that such a claim fails when there was probable cause to prosecute. . . ." *Id.* As detailed above, there was probable cause to have Andrew arrested for drug use and to have Kevin and Susan arrested for resisting and obstructing the officers.[7] Accordingly, dismissal was proper.

The standard for municipal liability in negligent hiring, training, and retention is deliberate indifference. *Id.* at 238. However, "[e]ven before reaching the issue of whether the municipality was deliberately indifferent . . . the plaintiff must demonstrate a constitutional violation at the hands of an agent or employee of the municipality." *Id.* Because Plaintiffs did not demonstrate that there were any constitutional violations, their municipal liability claim fails as well.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.

---

[7]The Strickers' argument that Assistant Prosecutor Riley is liable for "providing pre-arrest advice" to the officers is inapposite. It is true that the "act of giving legal advice to police" is not considered a part of a prosecutor's "role as an advocate intimately associated with the judicial phase of the criminal process." *Spurlock v. Thompson*, 330 F.3d 791, 798 (6th Cir. 2003). However, this simply means that Riley is only entitled to qualified immunity rather than absolute immunity. *See Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) ("Functions which are more 'investigative' or 'administrative' in nature, because they are more removed from the judicial process, are subject only to qualified immunity. . . . For example . . . giving legal advice to police.").