NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0498n.06

Case No. 15-6134

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 24, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHERYL DARLENE SINCLAIR, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| LAUDERDALE COUNTY, TENNESSEE; | ) | DISTRICT OF TENNESSEE |
| CLAY ALAN NEWMAN; STEVEN | ) | |
| SANDERS, Sheriff, | ) | |
| | | |
| Defendants-Appellees. | | AMENDED O P I N I O N |

BEFORE: NORRIS, McKEAGUE, and WHITE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Cheryl Sinclair spent thirty-seven days in jail after a misidentification led to her arrest. While her time in custody is tremendously unfortunate, the facts and circumstances at the time of her arrest were sufficient to establish probable cause for her arrest and prosecution. Because Ms. Sinclair has failed to establish a deprivation of her constitutional rights, we AFFIRM the district court's judgment dismissing Ms. Sinclair's claims under 42 U.S.C. § 1983.

I

On June 23, 2014, Cheryl Sinclair's son Stephen Sinclair pleaded guilty in the Circuit Court of Lauderdale County, Tennessee to aggravated assault, domestic assault, and simple possession of a schedule VI controlled substance. Mr. Sinclair was sentenced to three years'

imprisonment, to be suspended on the condition that he serve either six months in a rehabilitation facility or six months in the Lauderdale County Jail. Additionally, Mr. Sinclair received three years of supervised probation. Choosing six months of rehabilitation, Mr. Sinclair was placed in the Rose of Sharon rehabilitation program in Burlison, Tennessee.

As a condition to entering the Rose of Sharon, Mr. Sinclair agreed to a "Consent Order For Furlough" (Consent Order) signed by the circuit judge, an assistant district attorney, Mr. Sinclair's attorney, and Mr. Sinclair, and stamped by the circuit court clerk. The Consent Order established court-ordered requirements should Mr. Sinclair receive any temporary furloughs from the Rose of Sharon's rehabilitation program. One requirement was that his mother, Cheryl Sinclair, serve as his exclusive means of transportation to and from the facility. The Consent Order also explicitly stated that, "[i]f for any reason the defendant leaves the [Rose of Sharon] before completion, he must report immediately to the Lauderdale County Jail and the defendant's treatment facility should notify his attorney and case manager of his leaving the program." Failure "to return to the jail immediately within the time limits provided" would result in a charge of "'Escape' or 'Failure to Appear,' punishable according to the law." R. 38-3, Consent Order, PID 248. Mr. Sinclair entered the Rose of Sharon program on June 23, 2014.

After Mr. Sinclair had spent approximately one month at the Rose of Sharon, Cheryl Sinclair called Pastor Rose, the director of the rehabilitation program, and requested that Mr. Sinclair be granted temporary leave to participate in a fundraiser for the anticipated funeral expenses of his grandfather. In accordance with the Consent Order, Pastor Rose permitted Mr. Sinclair to attend the fundraiser, granting him temporary leave starting on Saturday, July 26 at 8:00 a.m. and requiring Mr. Sinclair to return to the Rose of Sharon by Sunday, July 27, 2014, at 4:00 p.m.

Mr. Sinclair attended the fundraiser that Sunday. However, instead of returning to the Rose of Sharon by 4:00 p.m., Mr. Sinclair spent the night with his girlfriend. On Monday morning, Mr. Sinclair's girlfriend drove him back to the Rose of Sharon. After arriving, they asked to speak to Pastor Rose, but the staff refused their request. Evidently believing that the police had been called and that he would be "kicked out of the program," Mr. Sinclair fled the Rose of Sharon and "went into hiding."

On Wednesday, July 30, 2014, the secretary of the Rose of Sharon sent a formal letter ("Rose of Sharon Letter" or "Letter") to Rebecca Cashion, Mr. Sinclair's probation officer, informing her that Mr. Sinclair had left the program. The Letter mistakenly reported that Mr. Sinclair returned to the Rose of Sharon on Monday with his mother, rather than with his girlfriend. The full text of the letter stated:

> This communication is to verify that Stephen Sinclair has been dismissed from the Rose of Sharon Recovery Center. He was granted a 24-hour pass this past weekend: leaving at 8 AM on July 26, 2014 and to return at 8 AM on July 27, 2014. His mother called to talk to Pastor Rose about him helping Sunday July 27th, with a benefit for her father, who has been diagnosed with cancer. Pastor told her that he would have to think about it but never gave his approval. She called on Sunday morning, the 27th to remind him about the benefit at 2 PM. Pastor told her that he had never given approval, but, since he was already late, he would allow him to be gone until 4 PM. He never showed nor called. The House Monitor called the number he gave on his pass sheet that he would be able to be contacted and he was not there but visiting somewhere else. So, he was considered AWOL. *He and his mother*[1] *came by on Monday the 28th to see Pastor Rose, but he was not available. It was reported that they left here and went to the Center and Stephen was very ugly and disrespectful to the authority there and the Program itself.*

R. 25-2, Letter, PID 129. Ms. Cashion then filed a petition in the Circuit Court asking the court to declare that Stephen had violated his probation. The Circuit Court granted that petition on

---

[1] Although he returned to the Rose of Sharon with his girlfriend, employees at the rehabilitation facility incorrectly reported that Mr. Sinclair was with his mother.

August 15, 2014, and issued a warrant for Stephen's arrest on suspicion "of violation of the terms on which the probation was granted."

On August 12, 2014, assistant district attorney Julie Pillow approached Christina Turner, an employee at the Lauderdale County Jail, and requested that Turner prepare and sign affidavits of complaint[2] against Mr. Sinclair for escape and failure to appear and against Cheryl Sinclair for accessory to escape after the fact. Turner was not a certified officer and reported the request to her supervisor, Lieutenant Elizabeth Kiestler. The two of them then brought the assistant district attorney's request to the attention of defendant Sheriff Steven Sanders. Turner provided Sheriff Sanders with the documents from Pillow, including the Rose of Sharon Letter, the Consent Order, and a factually similar indictment from the same jurisdiction charging another individual with "escape" for leaving the Rose of Sharon before his sixth month treatment was completed and failing to report to the Lauderdale County Jail. The materials provided to Sheriff Sanders also contained a note from Pillow indicating that Cheryl Sinclair should be charged with accessory after the fact. Sheriff Sanders gave the materials to one of his investigators, defendant Clay Newman, and instructed him to take care of the assistant district attorney's charging request. Newman reviewed the materials, ran Cheryl Sinclair's driver's license, and conducted a criminal history check before ultimately preparing the affidavit of complaint charging Ms. Sinclair with "Accessory after the fact (Felony Escape)" for "assisting [Mr. Sinclair] to knowingly and unlawfully leave a rehabilitation facility without reporting to the Lauderdale County Jail upon his release." R. 39-1, Defendants' Response to Plaintiff's Statement of

---

[2] Pursuant to Rule 3 of the Tennessee Rules of Criminal Procedure, an affidavit of complaint is a "statement alleging that a person has committed an offense" and must (a) be in writing, (b) "be made on oath before a magistrate or a neutral and detached court clerk authorized . . . to make a probable cause determination," and (c) allege the essential facts constituting the offense charged. According to the Advisory Commission Comment, these requirements "govern[] what must be done to secure the issuance of an arrest warrant." The parties treat "signing" an affidavit of complaint as synonymous with "signing a warrant."

Undisputed Facts, PID 348. The affidavit of complaint was presented to the circuit court clerk, who signed an arrest warrant.

That afternoon, law enforcement arrested Cheryl Sinclair at her home. Ms. Sinclair was transported to the Lauderdale County Jail where she was charged with accessory after the fact and her bond was set at $250,000. At Ms. Sinclair's first court appearance on September 18th, assistant district attorney Pillow dismissed all charges against Ms. Sinclair. Ms. Sinclair was released from custody after spending thirty-seven days in jail.

Cheryl Sinclair filed suit in district court under 42 U.S.C. § 1983 against defendants Lauderdale County, Sheriff Sanders, and Investigator Newman, alleging that defendants lacked probable cause for her prosecution and arrest. The district court granted summary judgment to the defendants and dismissed the case, holding that Ms. Sinclair could not prevail on her § 1983 claims because the defendants did not violate her Fourth Amendment rights. As a result, the district court also held that defendants were entitled to qualified immunity. We review an order granting summary judgment *de novo*. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

## II

Ms. Sinclair appeals her claims of false arrest and malicious prosecution. "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

There is no dispute that defendants were acting under color of state law. Thus, our inquiry is only whether the defendants deprived Ms. Sinclair of a constitutionally-protected right.[3]

### A. Probable Cause Framework

A plaintiff bringing a constitutional claim for false arrest under the Fourth Amendment bears the burden to prove "that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005). Similarly, a plaintiff can only succeed in a claim for malicious prosecution where she establishes that there was no "probable cause to prosecute." *See Stricker v. Twp. of Cambridge*, 710 F.3d 350, 365 (6th Cir. 2013). Therefore, both of Ms. Sinclair's claims hinge on whether she can establish that defendants lacked probable cause to sustain her arrest and prosecution. *See Young v. Owens*, 577 F. App'x 410, 413 (6th Cir. 2014).

Probable cause exists where the "'facts and circumstances within the officer's knowledge' [are] 'sufficient to warrant a prudent person . . . in believing . . . that the suspect has committed, is committing or is about to commit an offense.'" *Stricker*, 710 F.3d at 362 (quoting *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003)). "Probable cause requires only the probability of criminal activity [and] not some type of 'prima facie' showing." *Crockett*, 316 F.3d at 580 (internal quotation marks and citation omitted).

The probability of criminal activity is assessed under a standard of reasonableness and is "based on an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*." *Green v. Throckmorton*, 681 F.3d 853, 865 (6th Cir. 2012) (quoting *Crockett*, 316 F.3d at 580). A reviewing court must assess "the existence of probable cause 'from the perspective of a

---

[3] Though Cheryl Sinclair maintained a claim against Sheriff Steve Sanders in both his individual capacity and as Sheriff of Lauderdale County, she rarely mentions his role in Ms. Sinclair's arrest and prosecution and does not allege how he *personally* violated her constitutional rights. *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) ("[T]o overcome a qualified immunity defense . . . the violation [must be] committed *personally* by the defendant."). Because both parties' briefing focuses on the actions of Investigator Clay Newman, and because Sheriff Sanders is arguably liable only if Investigator Newman deprived Ms. Sinclair of a constitutional right, our focus centers on the actions of Investigator Clay Newman.

reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)). Officers are "under no obligation to give any credence to a suspect's story or alibi nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 1999) (quoting *Criss v. City of Kent*, 867 F.3d 259, 263 (6th Cir. 1988)).

### B. Did Investigator Newman Have Probable Cause to Arrest Cheryl Sinclair?

*1. Probable Cause to Believe Stephen Sinclair Committed Escape*

The reasonableness of defendants' probable cause determination to arrest Cheryl Sinclair is informed by first determining whether probable cause existed to arrest her son for committing the underlying crime of "escape." Under Tennessee law, the crime of "escape" is defined as the "unauthorized departure from custody or failure to return to custody following temporary leave for a specific purpose or limited period, *but does not include a violation of conditions of probation or parole*[.]" Tenn. Code Ann. § 39-16-601(3) (emphasis added).

As a threshold matter, Ms. Sinclair contends that the defendants erred in applying Tennessee's "escape" statute to Mr. Sinclair—and, derivatively, to Ms. Sinclair—because Stephen's fleeing the Rose of Sharon was a violation of his probation and thereby excluded from Tenn. Code Ann. § 39-16-601(3).[4] *See* Sinclair Br. at 45–50. Ms. Sinclair argues that, because Stephen could not have committed escape, no reasonable officer could conclude she committed accessory after the fact.

---

[4] There is some confusion as to whether defendants believe Mr. Sinclair committed escape on Sunday, July 27th when he failed to return either to the Rose of Sharon or Lauderdale County Jail after his furlough ended at 4 p.m., or on Monday, July 28th, when he returned to the Rose of Sharon with his "mother" (in actuality, his girlfriend) and then fled and went into hiding. *See* Defendants' Br. at 16–17. The defendants appear to argue both in the alternative. Nonetheless, to avoid the implication that Ms. Sinclair could be charged with accessory after the fact for *returning her son* to the rehabilitation center, we read defendants' arguments as claiming Mr. Sinclair's escape and Ms. Sinclair's accessory after the fact occurred *after* Mr. Sinclair left the facility on Monday, July 28th and failed to return to the Lauderdale County Jail.

Ms. Sinclair might be correct that the Tennessee criminal statutes were incorrectly applied: to Stephen, because he was on probation, and to Ms. Sinclair, because accessory after the fact presupposes the commission of an underlying felony. *See* Tenn. Code Ann. §§ 39-16-601(3), 39-11-411. However, we need not decide Stephen's status under Tennessee law because even if Stephen was on probation, defendants' mistake was not so unreasonable as to preclude probable cause for charging Mr. Sinclair with escape and, as a result, charging and arresting Ms. Sinclair with accessory after the fact. *See Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014) ("The Fourth Amendment tolerates only reasonable mistakes, and those mistakes—*whether of fact or of law*—must be objectively reasonable.") (emphasis added). Some circuits have interpreted *Heien* as suggesting that statutory ambiguity is prerequisite to holding that a mistake of law is "objectively reasonable,"[5] and we certainly do not wish to afford officers a "Fourth Amendment advantage through a sloppy study of the laws." *Id.* at 539–40. In this case, however, Investigator Newman's arguably mistaken application of the unambiguous "escape" statute may fairly be characterized as a mistake of fact regarding Mr. Sinclair's probation status. Given the other probative evidence carrying the full weight of legal authority, which suggested that Mr. Sinclair fell within the "escape" statute's ambit, the mistake was reasonable. The Consent Order, signed by the circuit judge, explicitly and prominently stated that Stephen would be charged with "escape" or "failure to appear" if he left the Rose of Sharon prematurely and did not return to jail. The similar grand jury indictment showed that another individual had previously been indicted for "escape" in the same jurisdiction under nearly identical circumstances. Finally, the Rose of Sharon Letter indicated that Mr. Sinclair had left the program, the triggering event in the Consent Order.

Moreover, Ms. Sinclair does not dispute that both Sheriff Sanders and Investigator Newman knew that these documents and the arrest warrant request originally came from assistant district

---

[5] *See United States v. Stanbridge*, 813 F.3d 1032, 1037 (7th Cir. 2016); *United States v. Alvarado-Zarza*, 782 F.3d 246, 250 (5th Cir. 2015); *but cf. Cahaly v. Larosa*, 796 F.3d 399, 408 (4th Cir. 2015).

attorney Pillow, a fact that reinforces both Investigator Newman's application of the "escape" statute and his probable cause determination.[6] *See Armstrong v. City of Melvindale*, 432 F.3d 695, 702 (6th Cir. 2006) (evaluating an officer's reliance on a prosecutor as a factor in determining the reasonableness of the officer's probable cause determination); *Crockett*, 316 F.3d at 584 (same). We therefore conclude that, in this particular situation, Investigator Newman's mistake was objectively reasonable and that a prudent person in his circumstances could have believed that Mr. Sinclair had committed the crime of escape. Accordingly, Investigator Newman was not unreasonable in also applying Tennessee's accessory after the fact statute to Ms. Sinclair.

### 2. *Probable Cause to Believe Cheryl Sinclair Committed Accessory After the Fact*

We now turn to whether Investigator Newman had probable cause to believe that Cheryl Sinclair committed the crime of accessory after the fact. Under Tennessee law, accessory after the fact is defined in relevant part as "providing the offender with any means of avoiding arrest, trial, conviction or punishment," with "knowledge or reasonable ground to believe that the offender has committed the felony, and with the intent to hinder the arrest, trial, conviction or punishment" of the offender. Tenn. Code Ann. § 39-11-411. All parties agree that Cheryl Sinclair was misidentified as a participant in Mr. Sinclair's "escape." Yet, "'[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'" *Crockett*, 316 F.3d at 582 (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)). The relevant question is whether, *at the time Investigator Newman signed the affidavit of complaint*, the facts and circumstances within his knowledge were "'sufficient to warrant a prudent person . . . in believing

---

[6] We fully acknowledge that, "where there is no legal basis for the contemplated action," reliance on an attorney's belief as the sole determinate of probable cause cannot absolve an officer by "automatically convert[ing] unreasonable actions into reasonable actions." *Cochran v. Gilliam*, 656 F.3d 300, 309 (6th Cir. 2011); *see also Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006). But that is not the case here, as the Consent Order, Rose of Sharon Letter, and similar grand jury indictment all contributed to Investigator Newman's probable cause determination. His reliance on the assistant district attorney's charging recommendation is an appropriate factor to consider in *further support* of the reasonableness of his probable cause determination.

. . . that the suspect ha[d] committed . . . an offense.'" *Stricker*, 710 F.3d at 362 (quoting *Crockett*, 316 F.3d at 580).

Ms. Sinclair argues that no reasonable officer would read the Rose of Sharon Letter and objectively believe she could have committed accessory after the fact. In her words, the "letter doesn't indicate that [she] helped [Mr. Sinclair] avoid arrest or punishment." Sinclair Br. at 35. Ms. Sinclair claims that the Letter merely indicated that they arrived at the Rose of Sharon together, but did "not indicate they left the Center together (or for that matter . . . indicate that they came together in the same vehicle)." Sinclair Br. at 36. Without an explicit statement that she left the Rose of Sharon with her son, Ms. Sinclair believes the Letter cannot justify a conclusion that she provided "any means" to help him avoid punishment. *See* Tenn. Code Ann. § 39-11-411.

But Ms. Sinclair understates the significance of the Letter, which contains multiple pieces of information important to Investigator Newman's probable cause determination. First, the Letter indicates that Ms. Sinclair personally arranged her son's temporary furlough, "call[ing] to talk to Pastor Rose about [Stephen] helping Sunday, July 27th, with a benefit for her father[.]" R. 25-2, Letter, PID 129. The Letter adds that Ms. Sinclair called again to extend Stephen's furlough so that he could participate in the benefit and return to the Rose of Sharon without being late. Since "[Stephen] was already late," Pastor Rose "allowed him to be gone until 4PM." Based on these telephone conversations, it would be reasonable for an officer to read the Letter to mean that Ms. Sinclair initially knew of her son's whereabouts and that she understood that he risked punishment for failing to comply with the furlough window. Second, though the Letter does not explicitly state that Ms. Sinclair and her son left the center *together*, it was not unreasonable for Investigator Newman to believe—albeit mistakenly—that they did so or that Ms. Sinclair assisted Stephen in *some* capacity. *See* Tenn. Code Ann. § 39-11-411 (stating that a defendant shall have committed the

crime by providing "*any means* of avoiding arrest . . . or punishment"). After all, the Consent Order explicitly mandated that Cheryl Sinclair was responsible for Mr. Sinclair's transportation.

And Investigator Newman's probable cause determination was not limited to the information in the Letter. At the time he signed the affidavit of complaint, he reasonably believed that (1) Ms. Sinclair had arranged for Stephen's temporary furlough, (2) Ms. Sinclair understood Stephen was to return by 4 p.m. on July 27th or else he would face punishment, (3) Ms. Sinclair *drove* Stephen to the Rose of Sharon on Monday the 28th, (4) Stephen had fled the Rose of Sharon and not returned to the Lauderdale County Jail, (5) the Consent Order and a nearly identical indictment suggested that Stephen had committed escape, and (6) the assistant district attorney had decided to prosecute both Stephen and Ms. Sinclair. Based on the circumstances at the time, it was reasonable for Investigator Newman to tie Ms. Sinclair's personal involvement in Stephen's July 28th visit to the Rose of Sharon with his subsequent fleeing of the facility. While the Letter would likely be insufficient to sustain a criminal conviction, a reasonable officer could find it enough to establish probable cause when read in conjunction with the other available evidence. *See Wong*, 371 U.S. at 498–99 (1963) (stating that, though probable cause requires "more than mere suspicion, it does not require proof sufficient to establish guilt") (internal citations and quotations omitted).

Of course, a reasonable officer would not be *compelled* to conclude that Ms. Sinclair committed accessory after the fact based on the information available. We could infer that, after Ms. Sinclair took her son to the Rose of Sharon and then to the Center where Stephen "was very ugly and disrespectful to the authority there," she got right back into her car and left him stranded at the facility without transportation. But that would not be the first inference a reasonable officer would draw so it was natural—and certainly not unreasonable—for Investigator Newman to believe that Stephen left in the same manner he believed he had arrived. Moreover, we need not speculate on every possible explanation for and manner of Stephen's "escape." Instead, we must address only

whether Investigator Newman's conclusion was permissible under the circumstances, and we hold that it was. *See Crockett*, 316 F.3d at 580.

    3.   *The Rose of Sharon Letter As Hearsay*

Ms. Sinclair also attacks probable cause from another angle, arguing that because the Letter is hearsay and was not independently corroborated, it cannot serve as a basis to establish probable cause. *See United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003); *see also United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (observing that "in the absence of any indicia of the reliability of an informant, courts insist that the affidavit contain substantial independent police corroboration").

However, *Helton* is a tipster case, discussing hearsay "from a confidential informant or an anonymous tipster" and explaining that, in such a context, the "court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances for evaluating the impact of that information." 314 F.3d at 819. The Rose of Sharon Letter is not from an anonymous tipster or confidential informant, but instead came from an independently credible source: the secretary of the organization (and wife of the pastor) charged with custody of Mr. Sinclair. *See Wesley v. Campbell*, 779 F.3d 421, 430 (6th Cir. 2015); *see also United States v. Ventresca*, 380 U.S. 102, 108 (1965) (explaining that hearsay "may be the basis for issuance of the warrant so long as there is a substantial basis for crediting the hearsay"). A "finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citing *United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006)). The Rose of Sharon Letter meets this standard.

### III

Ms. Sinclair also makes a cursory allegation that her constitutional rights were violated by defendants' purported malicious prosecution. Such a claim fails "when there was probable cause to prosecute, or when the defendant did not make, influence, or participate in the decision to prosecute." *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007). As we have already held that defendants had probable cause, Ms. Sinclair's malicious prosecution claim must fail. *See Stricker*, 710 F.3d at 365 (treating probable cause to arrest as synonymous with probable cause to prosecute); *Marcilis v. Twp. of Redford*, 693 F.3d 589, 604 (6th Cir. 2012) (same).

### IV

We conclude that defendants had probable cause to arrest and prosecute Cheryl Sinclair and therefore did not deprive her of a constitutional right. Because Ms. Sinclair is unable to establish a constitutional deprivation, her claims under § 1983 fail as a matter of law against all defendants.[7] *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no [municipal] liability under *Monell* without an underlying constitutional violation."). Accordingly, we AFFIRM the decision of the district court.

---

[7] Because we find no constitutional violation, Ms. Sinclair is unable to state a claim for relief and we need not determine whether defendants are entitled to qualified immunity. Nonetheless, because defendants did not engage in a violation of Ms. Sinclair's constitutional rights, they would be entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

Although I do not agree there was probable cause to arrest Sinclair, I conclude that Defendants Newman and Sanders are entitled to qualified immunity under the circumstances, and join in the affirmance of the grant of judgment on these claims for that reason. However, I would reverse the grant of judgment to Lauderdale County and remand for further proceedings on that claim.

Under Tennessee law, Sinclair could have been charged with accessory only if she "provid[ed] the offender with any means of avoiding arrest, trial, conviction or punishment." Tenn. Code Ann. § 39-11-411. Regardless whether police had probable cause to arrest Stephen for escape, the materials available to police offered no information about Sinclair's conduct after Stephen allegedly committed the crime by failing to report to the county jail after he was dismissed from the Rose of Sharon. The letter from the Rose of Sharon stated only that (1) Sinclair accompanied her son to meet the pastor, who was unavailable, (2) the pair went to the recovery center, where Stephen "was very ugly and disrespectful," and (3) Stephen was dismissed from the program. R. 25-2, Letter, PID 129. The Consent Order stated only that Sinclair would transport Stephen to and from the county jail. R. 38-3, Consent Order, PID 248–49. Based on these materials, Newman did not have probable cause to believe Sinclair was an accessory.

However, qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), and "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986) (citation omitted). *Cf. Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) ("[A]n arresting agent is entitled to qualified immunity if he or she could

reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent.").

Here, police could have reasonably (if erroneously) believed there was probable cause. The letter from the Rose of Sharon and the Consent Order support the conclusion that Stephen committed escape, and the inference that Sinclair assisted her son in failing to report to the jail was not so unreasonable as to deprive the individual defendants of immunity. Further, police relied on the legal judgment of the prosecutor. Although we have made clear that an attorney's blessing does not shield an investigator from liability, *e.g.*, *Cochran v. Gilliam*, 656 F.3d 300, 309 (6th Cir. 2011); *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006), the prosecutor's instruction to obtain an arrest warrant supports the reasonableness of the mistake under these circumstances. *Cf. Konja v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004). Thus, although there was no probable cause to arrest Sinclair, I conclude that the individual defendants are entitled to qualified immunity.

However, that defense is not available to Defendant Lauderdale County. "A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). However, "local governments are responsible only for 'their own illegal acts,'" and are not vicariously liable for their employees' actions. *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Thus, "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury," *id.* at 60-61 (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)), and a "single unconstitutional act or decision, when taken by an authorized decisionmaker, may be considered a policy and thus subject a county to liability." *Bible Believers v. Wayne County*, 805 F.3d 228, 260 (6th Cir. 2015) (en banc).

Plaintiff has supported her claim that the sheriff "establishes Lauderdale County policy with respect to the arresting and detention of persons in the Lauderdale County Jail," and that he

"instructed" an investigator "to sign an Affidavit of Complaint" charging Plaintiff, but "did not independently review the materials . . . to determine whether they established probable cause." R. 39-1, Defs.' Resp. to Pl.'s Statement of Undisputed Facts, PID 346–47. Plaintiff has sufficiently demonstrated issues of material fact as to whether the sheriff made "a 'deliberate choice to follow a course of action . . . from among various alternatives'" that was "the moving force behind the cause of the plaintiff's harm." *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013) (quoting *Pembaur*, 475 U.S. at 483).