[Cite as *State v. Ware*, 2019-Ohio-3885.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                    :

                              :      Case No. 18CA3669

      Plaintiff-Appellee,          :

                              :

      vs.                          :      DECISION AND JUDGMENT

                              :      ENTRY

REGINALD WARE,                    :

                              :

      Defendant-Appellant.          :      **Released: 09/23/19**

_____

APPEARANCES:

Roger Soroka, Joshua Bedtelyon, and Aaron Jones, Columbus, Ohio, for Appellant.

Jeffery C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Assistant Ross County Prosecuting Attorney, Chillicothe, Ohio, for Appellee.

_____

McFarland, J.

{¶1}  This is an appeal from a Ross County Court of Common Pleas judgment entry convicting Appellant, Reginald Ware, of tampering with evidence.  Appellant asserts that the trial court erred when (1) it denied his motion to suppress the evidence, and (2) it denied his motion to exclude witness testimony at the suppression hearing after a violation of the court's order for separation of witnesses.  After reviewing the law and the record, we find Appellant's first assignment of error has merit.  Therefore, we

vacate Appellant's conviction, reverse the trial court's judgment to the extent that it denied Appellant's motion to suppress, and remand the case to the trial court for further proceedings consistent with this decision.

FACTS AND PROCEDURAL HISTORY

{¶2} After being stopped for a Chillicothe ("City") traffic ordinance violation on April 26, 2017, officers arrested Appellant after he allegedly tried to conceal or ingest a baggie filled with white powder. Officers believed that he was trying to conceal contraband. Appellant allegedly spit out the bag onto the jail floor where its contents spilled. The baggie was confiscated by law enforcement.

{¶3} On June 16, 2017, the State returned an indictment charging Appellant with tampering with evidence in violation of R.C. 2921.12, a third degree felony.

{¶4} On September 6, 2017, Appellant filed a motion to suppress all evidence related to the traffic stop on April 26, 2017, which included the baggie and the results of a urine test. Appellant argued that the police lacked probable cause to initiate the traffic stop, detained Appellant longer than necessary to complete the traffic stop, and police did not have Appellant's consent to have his urine withdrawn and tested.

**{¶5}** On February 2, 2018, the trial court held a suppression hearing during which the following testimony was elicited.

**{¶6}** The State's first witness, Officer Christopher King, a canine officer for the Chillicothe Police Department, testified that on April 26, 2017 he headed to the Dairy Queen on North Bridge Street in Chillicothe after being informed that Appellant was at that location, and then was backup officer for the officer who initiated a traffic stop of Appellant. Officer King testified that he was the second officer on the scene and estimated that he arrived one to two minutes after the traffic stop by Officer Rhodes. Officer King testified that fellow Officer Short arrived shortly thereafter. Officer King testified that once he was at the scene, he was instructed to deploy his canine for a "free air sniff" around Appellant's vehicle. Officer King then narrated to the court his body camera video of his canine circling Appellant's vehicle and then sitting, which, according to Officer King, was an indication the canine had detected drugs. Officer King testified that Officer Rhodes then removed Appellant from his vehicle. Officer King testified that once Appellant was out of his vehicle, it appeared that he attempted to swallow something, and tried to "evade" the officers. Officer King testified that he observed Appellant using his fingers to "shove stuff

down his throat," and consequently Officer King did not believe Appellant was choking, but instead was attempting to swallow contraband.

{¶7} Officer King testified that based on his canine's indication, he searched Appellant's vehicle and discovered marijuana. The court observed a portion of Officer King's body camera video of the incident during his testimony.

{¶8} On cross examination, Officer King testified that he was on his way to Appellant's location prior to the traffic stop because officers were aware of Appellant's criminal history, as Officer King explained: "Yes. You know, this - - we don't do this to ordinary citizens. We take totality of the circumstances from the tips we receive plus prior engagements and from the - - you know, any informant information. You know, I believe it's our duty to protect our city and these people are going to come to our attention and their [*sic*] either going to confirm or dispel any of these tips." When asked about his reference to "tips," Officer King testified that the department had received tips that Appellant had trafficked drugs at "Beau Circle" and "Columbus Street," and while he had not followed up on any of the tips, his unit had. However, Officer King admitted that he had not received any tips that Appellant had engaged in trafficking that day.

{¶9} After the conclusion of Officer King's testimony, the judge asked several questions. The judge noted that Appellant was charged with destroying evidence. He then asked the prosecutor what evidence she was referring to and prosecutor responded that the baggie that Appellant had in his mouth contained cocaine. The prosecutor stated that the baggie was recovered once Appellant was at the jail after he vomited, and that the substance in the baggie tested positive for cocaine. She testified that after Appellant arrived at the jail they took him to the hospital because they feared he might have consumed some of the cocaine. The prosecutor further stated that Appellant was treated and released back to jail. The prosecutor stated that a urinalysis confirmed that cocaine was in Appellant's urine. Finally, the prosecutor stated that the baggie was in evidence "to be sent off."

{¶10} The State's next witness, Sargent Short, testified that at the time of Appellant's arrest, he was working in the Drug Interdiction Unit. Sargent Short testified that he heard over the radio that Officer Rhodes had made a traffic stop and he proceeded to the Dairy Queen as backup. The State proceeded to show the video from Sargent Short's body camera. Sargent Short testified that upon arriving he was informed by Officer King that he had recovered drugs from Appellant's vehicle on another occasion. Sargent Short testified that because Officer Rhodes was having a conversation with

Appellant on the driver side of the vehicle, he positioned himself near the passenger side of the vehicle when he noticed Appellant was breathing heavily and putting a lot of food in his mouth. Sargent Short testified that because of Officer King's information and Appellant's actions, he ordered Officer King to "run" his canine around Appellant's vehicle while Officer Rhodes was verifying Appellant's information.

{¶11} Sargent Short testified that after Officer's King's canine alerted to Appellant's vehicle, the officers asked Appellant to exit his vehicle. Sargent Short testified that he noticed a strong odor of an air fresher as Appellant exited his vehicle, which is often used to cover drug odors, and that Appellant had a "bulge" in his mouth and was chewing. Sargent Short testified that after Appellant spit out some food, he asked Appellant to open his mouth wider, but Appellant stuck his fingers in his throat and started gagging and coughing. Sargent Short testified that he told Appellant to cough thinking Appellant might be choking. However, he testified that Appellant was pulling away and continuing to stick his fingers in his mouth until he pulled out a baggie that contained a white substance, then Appellant's demeanor changed and he fled. Sargent Short testified that the officers caught Appellant and handcuffed him. Sargent Short testified that Appellant still had a "bulge" in his mouth and he was still chewing.

{¶12} On cross examination, Sargent Short testified that he saw Appellant pull a baggie with a white substance out of his mouth, but admitted that it could not be seen in his body camera video.

{¶13} After the conclusion of Sargent Short's testimony, defense counsel moved to strike any testimony from the State's witnesses "moving forward from anybody that was outside" based on the State's violation of the court's witness separation order.  Defense counsel asserted that the prosecutor spoke to Sargent Short outside the courtroom after he was finished testifying about his testimony, within earshot of potential witnesses. Counsel alleged he could hear the discussion in the courtroom and therefore assumed that witnesses were within earshot of that discussion.

{¶14} In response, the prosecutor admitted to talking to Sargent Short, but asserted the officer closest to her was not testifying in Appellant's case. The prosecutor further asserted that she did not believe that the two officers who had already testified, Officer King and Sargent Short, would have had time to discuss their testimony and neither testified differently from what their video showed.  The court then summoned the State's additional witnesses, Detectives Wallace and Taczak, and Officer Rhodes, into the courtroom.  The court notified the witnesses of the witness separation order and its purpose of keeping witnesses from corroborating their testimony.

The court told the witnesses not to discuss their testimony with the other witnesses and to leave the court once their testimony was complete. The court then asked defense counsel "is that sufficient, counsel, or do you want something else?" Counsel responded: "At this time, your honor, that's sufficient."

{¶15} The State then called Detective Taczak of the Chillicothe Police Department, who was part of the drug unit. Detective Taczak testified that she was familiar with Appellant from another case, and heard of Appellant's traffic stop over the radio and observed it from a nearby parking lot until Appellant fled. She testified that she approached Appellant once he had been apprehended and asked him to spit out whatever was in his mouth. She testified that Appellant's mouth was bleeding and his head was face down so she could not tell if there was anything in his mouth.

{¶16} Detective Taczak testified that when she arrived at the jail, Sargent Short advised her that Appellant spit out what he had in his mouth onto the floor of the jail and stomped on it, causing the white powder to spill onto the floor. Detective Taczak testified that she conducted a field test on the powder for cocaine and it was positive.

{¶17} On cross examination, Detective Taczak testified that she had not received any tip that Appellant had been involved in drug activity that

day.  Detective Taczak confirmed that she did not recover the powder from the floor of the jail herself.  She also admitted that although the area where Appellant was initially held was equipped with video surveillance, she did not check the video to confirm that Appellant had in fact spit the baggie on the floor.  Detective Taczak testified that she never tested the baggie that contained the powder.

{¶18} Detective Wallace of the Chillicothe Police Department testified for the State, asserting that he was familiar with Appellant because of prior drug trafficking.  On the date of Appellant's arrest, Detective Wallace noticed Appellant pulling into the Dairy Queen from Bridge Street in Chillicothe.  Detective Wallace testified that when Appellant exited the Dairy Queen, he made a right or northbound turn onto North Bridge Street, which has two lanes travelling northbound, but "[Appellant] turned across one lane into the lane closest to the double – the center line – the double yellow line instead of turning to the lane closest to him which would have been the curb lane."  Detective Wallace testified that Appellant violated Chillicothe ordinance 331.10, which he testified states:  "The driver of a vehicle intending to turn at an intersection shall be governed by the following rules: approach for a right turn and a right turn shall be made as close as practical to the right-hand curb or edge of the roadway."  Detective

Wallace testified that he put out notice of the violation on the channel used by the drug unit, which included Officers Rhodes, King, Short, and Detective Taczak. Detective Wallace testified that Officer Rhodes responded that he would stop Appellant. He testified that it is normal practice for officers in unmarked cars to notify officers in marked cars about traffic violations. Detective Wallace testified that while he was observing the traffic stop and noticed Appellant flee, he got out of his car and attempted to cut off Appellant, but Officers Rhodes, King, and Short got him to the ground first. Detective Wallace testified that he noticed Appellant was putting his hands near his mouth and assumed he was putting something in or taking something out of his mouth and noticed a bulge in his cheek when he got to Appellant. Detective Wallace testified that based on his experience and after speaking with Appellant, it was his belief that Appellant was attempting to conceal something in his mouth.

{¶19} Detective Wallace testified that Appellant was transported to the Ross County Jail. He further testified that when he arrived at the jail, he explained to Appellant that if he brought contraband into the jail he would face further charges. Detective Wallace testified that a baggie was hanging out of Appellant's mouth, which he sucked back in when one of the corrections officers tried to remove it, but then spit it out on the floor, which

Detective Wallace believed was collected as evidence. The State then showed a video. Detective Wallace testified that once inside the booking area, Appellant vomited. Detective Wallace testified that the jail would not accept Appellant until he was medically cleared, so he called a squad, which transported Appellant to Adena Regional Medical Facility. Detective Wallace testified he went to the hospital as well. He also testified there were officers from the Adena Police Department, as well as hospital security guards. Detective Wallace testified that the hospital staff drew bodily fluids from Appellant and at the staff's request he helped hold down Appellant while the fluids were withdrawn, but taking the fluids was not at Detective Wallace's request.

{¶20} On cross examination, Detective Wallace testified that while he was observing Appellant the day prior to his arrest, he saw nothing that would have led him to believe that Appellant was trafficking drugs. Detective Wallace testified that while he held Appellant down, hospital staff inserted something into Appellant's penis and drew his blood. When asked if these procedures were required for Appellant to be cleared to return to the jail, Detective Wallace testified "what [the hospital] has to do to clear someone, I have no idea. * * * They asked if we would help [Adena] police and security staff to restrain [Appellant] so they could perform the medical

procedures they needed to perform." He testified that after these procedures were completed Appellant was transported back to the jail.

{¶21} The State's next witness was Officer Rhodes of the Chillicothe Police Department. At the time of Appellant's arrest, Officer Rhodes was a uniformed officer with the special investigations unit. Officer Rhodes testified that on the day of Appellant's arrest, he heard Detective Wallace's radio broadcast that Appellant had committed a traffic violation and headed for Appellant's location. Officer Rhodes testified that after he located Appellant, he executed a traffic stop. Officer Rhodes testified that Officer King arrived at the scene next. Officer Rhodes testified that he introduced himself as a police officer to Appellant and then asked for his license, registration, and insurance. He testified that he could not remember the citation he gave to Appellant, but it did result in a ticket. Officer Rhodes testified that the ticket indicated Appellant had an expired license, had made a "marked lanes" violation, and violated city ordinance 331.08. However, Officer Rhodes testified that both named violations were in fact mistaken. Officer Rhodes testified that the actual violation committed by Appellant that day is found in city ordinance 331.10, which requires a motorist when turning right at an intersection, to do so as close to the right-hand curb as practical. Officer Rhodes testified that he determined Appellant's license

was expired as Officer King's canine sniffed Appellant's vehicle and alerted to the presence of drugs. Officer Rhodes testified when the canine alerted, he removed Appellant from his vehicle when he noticed Appellant had put something in his mouth the moment he opened his door. Officer Rhodes testified that he saw french fries in Appellant's car. Officer Rhodes estimated that from the time they removed Appellant from his car until he started choking was a minute to a minute and a half. Officer Rhodes testified that Appellant starting sticking his fingers in his throat and Sargent Short stated that there was a baggie in Appellant's mouth. Officer Rhodes testified that when Appellant fled, the officers chased him and took him to the ground. Officer Rhodes testified that Appellant still "obviously had something in his mouth." Officer Rhodes testified that even after Appellant was placed in the cruiser, Appellant still had a "bulge" in his mouth that he was "manipulating."

{¶22} Officer Rhodes testified that a video showed him putting on rubber gloves to pick up the baggie that Appellant spit onto the floor of the jail. Officer Rhodes testified that he rode from the jail to the hospital with Appellant in the squad. Officer Rhodes testified that he never asked any of the staff at the hospital to draw Appellant's blood. Officer Rhodes testified

that he remained at the hospital until Appellant was released, at which time he took Appellant back to the jail.

{¶23} On cross examination, Officer Rhodes testified that Detective Wallace radioed that Appellant made a marked lanes violation or turning violation, but Officer Rhodes could not remember which one. Officer Rhodes also testified that Officer King never verbally told him that his canine alerted to Appellant's vehicle, but asserted that having worked with Officer King and Sargent Short for two years he knew that when a canine sits, that is an alert. Officer Rhodes confirmed that the jail would not accept Appellant until he was medically cleared because he vomited and might be ill. He also testified that he informed the hospital that Appellant was suspected of having taken drugs. Officer Rhodes also admitted the substance recovered from the jail floor had not yet been sent for testing to the Ohio Bureau of Criminal Identification and Investigation (BCI) almost ten months after the arrest. At that point, the prosecutor interjected that tampering with evidence was the only charge pending.

{¶24} On February 9, 2018, the court issued a "preliminary decision" that was subject to post-hearing memoranda. The court made the following preliminary findings and conclusions: (1) the traffic stop for making an improper turn was supported by reasonable suspicion; (2) the traffic stop

was not invalidated by the officer's mistaken reference to the wrong citation and violation; (3) during the stop the canine properly indicated that Appellant's vehicle contained drugs, permitting the officer to make Appellant exit his vehicle; (4) officers saw Appellant pushing an object into his mouth and he attempted to flee, justifying officers to transport Appellant to jail; (5) video showed Appellant spitting out a baggie and its contents onto the floor of the jail and vomiting and the baggie and its contents were properly recovered by an officer but had yet to be tested and the field test results are inadmissible; and (6) because Appellant vomited the jail would not accept him, so he was transported to the hospital where he was subject to non-consensual blood and urine withdraws.

{¶25} On April 4, 2018, the trial court issued a judgment entry granting in part and denying in part Appellant's motion to suppress. The trial court found that the police had reasonable suspicion that Appellant had violated city ordinance 331.10 by not using the curb lane to make a right-hand turn, thereby justifying the traffic stop. The court further found that Officer Rhodes correctly described Appellant's traffic violation of making an improper turn under city code 331.10 in the citation issued, and therefore his mistaken citation of city code 331.08 did not invalidate the traffic stop.

**{¶26}** The court further found that paragraphs 3, 4, 5, and 6 from its preliminary decision remain unchanged.

**{¶27}** The trial court's judgment entry stated that the prosecution indicated that it did not intend to introduce the results of Appellant's urine test, but would introduce the February 21, 2018 BCI lab results of the baggie that Appellant spit onto the jail floor.  The defense objected, stating that it would have more thoroughly cross-examined the witnesses had it known about the baggie test results at the time, such as the chain of custody.  The court held that the chain of custody is not a suppression issue, and Appellant should have anticipated that the State may have the baggie tested, and therefore cross-examined witnesses about their seizure of the baggie.

**{¶28}** Accordingly, the trial court denied Appellant's motion to suppress the results of the testing of the baggie, but granted Appellant's motion to suppress the hospital test results and Appellant's medical records.

**{¶29}** On July 18, 2018, Appellant pleaded no contest to tampering with evidence.  The trial court found Appellant guilty and sentenced him to 12 months in prison with three years of discretionary post-release control.  It is from this judgment that Appellant appeals, asserting two assignments of error.

ASSIGNMENTS OF ERROR

"I. THE TRIAL COURT ERRED WHEN IT DENIED
APPELLANT'S MOTION TO SUPPRESS EVIDENCE.

II. THE TRIAL COURT ERRED WHEN IT DENIED
WARE'S MOTION TO EXCLUDE WITNESS
TESTIMONY AT THE SUPPRESSION HEARING
AFTER A VIOLATION OF THE COURT'S ORDER
FOR SEPARATION OF WITNESSES."

ASSIGNMENT OF ERROR I

{¶30} In his first assignment of error, Appellant initially argued that

the trial court improperly used the reasonable suspicion standard that

criminal behavior had occurred to evaluate the reasonableness of the traffic

stop, instead of using the probable cause standard.

{¶31} Appellant also argued that the traffic stop was merely a pretext

for stopping Appellant in order to investigate him.  In support, Appellant

cites an excerpt from Officer King's trial testimony in which he stated: "You

know, this - - we don't do this to ordinary citizens."

{¶32} Finally, Appellant argued that the ordinance upon which his

traffic stop was based does not state that a motorist must always be in the

rightmost lane when making a right-hand turn, but only close as practical to

the right-hand side of the road.  And, therefore, he argues, because the State

did not submit proof of that element it failed its burden of proving by a

preponderance of the evidence that the stop was initiated with sufficient cause to be constitutional under the Fourth Amendment.

{¶33} In response, the State argued that a traffic stop may be reasonable under either the reasonable suspicion or probable cause standards, citing *State v. Mays*, 119 Ohio St.3d 406, 894 N.E.2d 1204. The State also argued that if the traffic stop is reasonable under the Fourth Amendment then other motivations by law enforcement are irrelevant to the analysis. And finally, the State argued that like *Mays* the failure of the State to prove that Appellant made a turn in the right-hand lane could be a defense to the violation, but it is irrelevant to determining the reasonableness of the traffic stop.

{¶34} In his reply, Appellant concedes that under *Mays* a traffic stop can be found to be reasonable under either the probable cause standard or the reasonable suspicion standard, which the trial court applied.

{¶35} However, Appellant also argues that city code 331.10, which sets outs rules for turning at intersections, did not apply to his traffic stop because his turn did not occur at an intersection as defined in city code 301.17(a). Therefore, he argues, the traffic stop was unreasonable under the Fourth Amendment.

ANALYSIS

1.  Standard of Review

**{¶36}** The standard of review of a decision addressing a motion to suppress presents a mixed question of law and fact.  *State v. Ralston*, 4th Dist. Highland No. 16CA9, 2017-Ohio-7057, ¶ 6.  On review, we must accept the trial court's determination of factual issues and evaluation of credibility of witnesses if supported by competent, credible evidence.  *Id*. However, accepting those facts as true, we have a duty to conduct a de novo review of "whether the facts satisfy the applicable legal standard."  *Id*., citing *State v. Hobbs*, 133 Ohio St.3d 43, 2012-Ohio-3886, 975 N.E.2d 965, ¶ 8.

2.  Traffic Stops

**{¶37}** " 'The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures.' " *State v. Taylor*, 4th Dist. Lawrence No. 15CA12, 2016-Ohio-2781, ¶ 31, quoting *State v. Emerson,* 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15.  "The constitutional provisions contain nearly identical language and have been interpreted to afford the same protection." *Id*., citing *State v. Hoffman,* 141Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993 N.E.3d 993, ¶ 11.  " '[S]earches conducted outside the judicial process,

without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.' " *State v. Debrossard*, 4th Dist. Ross No. 13CA3395, 2015-Ohio-1054, ¶ 10, quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).  "Once the defendant demonstrates that he was subjected to a warrantless search or seizure, the burden shifts to the state to establish that the warrantless search or seizure was constitutionally permissible."  *Id.*, citing *Roberts* at ¶ 98; *Maumee v. Weisner,* 87 Ohio St.3d 295, 297, 720 N.E.2d 507 (1999); *Xenia v. Wallace,* 37 Ohio St.3d 216, 524 N.E.2d 889 (1988), paragraph two of the syllabus.

{¶38}  A traffic stop initiated by a law enforcement officer is a warrantless Fourth Amendment seizure.  *State v. Rose*, 4th Dist. Highland No. 06CA5, 2006-Ohio-5292, ¶ 14, citing *Whren v. United States*, 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1966).  However, "a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime."  *State v. Brandenburg*, 2012-Ohio-4926, ¶ 13, citing *Delaware v. Prouse* (1979), 440 U.S. 648, 663, 99 S.Ct. 1391.  A traffic stop

may also be reasonable under the more rigorous probable cause standard. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23.

{¶39} "[I]f an officer observes a suspect commit a traffic violation, the officer then possesses both a reasonable suspicion of criminal activity and probable cause to stop the vehicle." *State v. McDonald*, 4th Dist. Washington No. 04CA7, 2004-Ohio-5395, ¶ 20. "In traffic stop cases that do not involve a specific violation of traffic laws or regulations, courts must determine whether an officer possessed a reasonable suspicion of criminal activity, based on articulable facts, to stop a vehicle and to detain the driver." *State v. Tarlton*, 4th Dist. Pike No. 02CA688, 2002-Ohio-5795, ¶ 10.

{¶40} In *Heien v. North Carolina*, 574 U.S. 54, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014), the Supreme Court recognized that if an officer initiating a traffic stop makes a reasonable mistake of law, the stop may still be reasonable under the Fourth Amendment. In so holding, the court recognized that reasonableness is the touchstone of Fourth Amendment jurisprudence and "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.' " *Id*., quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69

S.Ct. 1302, 93 L.Ed. 1879 (1949). After recognizing that searches and seizures based on some reasonable mistakes of fact may be constitutional, the court went on to state that reasonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion. Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground. Whether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: the facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law. *Id.*, citing *Heien v. North Carolina*, 574 U.S. 54, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014).

{¶41} Therefore, " '[t]he existence of probable cause [or reasonable suspicion] depends on whether an objectively reasonable police officer would believe that [the driver's] conduct * * * constituted a traffic violation, based on the totality of the circumstances known to the officer at the time of the stop.' " *State v. Levine*, 4th Dist. Washington No. 18CA19, 2019-Ohio-265, ¶ 25, quoting *Bowling Green v. Godwin,* 110 Ohio St.3d 58, 2006-

Ohio-3563, 850 N.E.2d 698, at ¶ 16.  This "objective standard * * * requires officers to have a reasonable knowledge of what the law prohibits."  *State v. Rees*, 4th Dist. Gallia No. 88CA17, 1989 WL 145614, at *7.

{¶42} Courts applying *Heien* have recognized that if a statute is unambiguous in the scope of its application, it is not objectively reasonable for an officer to charge an individual with a violation of that statute within the context of the Fourth Amendment.  *See, e.g., Sinclair v. Lauderdale Cty., Tennessee*, 6th Cir. No. 15-6134, 652 Fed.Appx. 429, *United States v. Stanbridge*, 813 F.3d 1032, 1037 (7th Cir. 2016), *United States v. Alvarado-Zarzo*, 782 F.3d 246, 250 (5th Cir. 2015), *State v. Eldridge*, 790 S.E.2d 740, 743-44 (N.C. App. 2016), *State v. Cortez*, 512 S.W.3d 915, 924-25 (Tex. App. 2017), *State v. Rand*, 209 So.3d 660, 665–66 (Fla. App. 2017).  "[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce."  *Heien*, 135 S.Ct. at 539-540.

{¶43} The traffic stop initiated by Officer Rhodes, pursuant to Detective Wallace's observation of Appellant, was based on Chillicothe ("City") ordinance 331.10, entitled "Turning at *Intersections*," which provides in pertinent part that "(a) The driver of a vehicle intending to turn at an *intersection* shall be governed by the following rules: (1) Approach for a right turn and a right turn shall be made as close as practicable to the right-

hand curb or edge of the roadway." (Emphasis added.) City ordinance 301.17 states: " *'Intersection' means*: (a) The area embraced within the prolongation or connection of the lateral curb lines, or, if none, the lateral boundary lines of the *roadways of two highways that join one another* at, or approximately at, right angles, or the area within which vehicles traveling upon different highways that join at any other angle might come into conflict. *The junction of an alley or driveway with a roadway or highway does not constitute an intersection unless the roadway or highway at the junction is controlled by a traffic control device.* (Emphasis added.)

{¶44} Considering that city ordinance 331.10 provides rules that apply specifically to intersections and city ordinance 301.17 states that the junction between a driveway or alley and a roadway is not an intersection, it is clear that city ordinance 331.10 does not apply to turns made from driveways or alleys onto a city street, if no traffic control device is present. *State v. Rubsam*, 9th Dist. Medina No. 18CA0089-M, 2019-Ohio-2153, ¶ 11. (R.C. 4115.25(A) requires that on roadways *of sufficient width*, a vehicle * * * shall be driven upon the right half of the roadway. The vagueness of the "of sufficient width" language means that "a law enforcement officer could * * * reasonably err with respect to facts or law in conducting a valid traffic stop" for failing to drive on the right half of the roadway.)

{¶45} In viewing the *Google* aerial and street-view maps at 171 North Bridge Street in Chillicothe, the location of the Dairy Queen where Appellant was stopped, there is no intersection as defined in ordinance 331.10 at the point of egress from the Dairy Queen to North Bridge Street. Rather, an unnamed driveway connects the Dairy Queen parking lot to Bridge Street, and there is no traffic control device at that location.[1] Accordingly, ordinance 331.10 did not apply to the turn Appellant made from the Dairy Queen driveway onto North Bridge Street on April 26, 2017. "This is not a case where the law in question is 'genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work[.]' " *Harris v. State*, 344 Ga.App. 572, 575, 810 S.E.2d 660 (2018), quoting *Heien*, 135 S.Ct. at 541 (Kagan, J., concurring). In fact, the citation upon which the traffic stop was initiated stated that Appellant's vehicle was "turning from a *private drive* onto N. Bridge St. N/B. Once the vehicle turned onto N. Bridge St., it immediately got into the left-hand lane and not into the right curb lane." (Emphasis added.) Here, and for argument sake, assuming that it was reasonable for Detective Wallace and Officer Rhodes to misapply the application of ordinance 311.10, Officer Rhodes, who actually

---

[1] "Evid.R. 201(B) permits courts to take judicial notice of facts which are not subject to reasonable dispute and which are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *Wiseman v. Cambria Prod. Co.*, 61 Ohio App.3d 294, 300, 572 N.E.2d 759 (4th Dist.), quoting Evid.R. 201(B).

stopped Appellant and issued the citation, effectively admitted that Appellant's turn was not governed by ordinance 311.10 because he cited Appellant for making an improper turn from a driveway that had no traffic control device. As such, we have little difficulty in holding that under an objective reasonable police officer standard, Officer Rhodes, under the totality of the circumstances at the time, would not have believed that Appellant's conduct constituted a traffic violation.

{¶46} Before we conclude, we feel compelled to address one last issue. Appellant argues that Officer King's testimony - "You know, this - - we don't do this to ordinary citizens" - indicates that the stop was a mere pretext to investigate Appellant.

{¶47} The testimony of Officers King and Rhodes, Sargent Short, and Detectives Wallace and Taczak, as part of the drug task force, indicates that they were following and observing Appellant because of his prior dealing in drugs. When read in context, Officer King's testimony at the suppression hearing – "You know, this - - we don't do this to ordinary citizens" – refers, not to why the officers stopped Appellant, but to why Officer King was heading to the Dairy Queen where Appellant had been spotted even before Officer Rhodes initiated the traffic stop. It is apparent that these officers and detectives were surveilling Appellant and waiting for him to commit a traffic

violation that would allow them to stop him and possibly search him for drugs. However, "mere surveillance in public places does not implicate the protection of the Fourth Amendment's prohibition against unreasonable searches and seizures." *State v. Harlow*, 4th Dist. Washington No. 13CA29, 2014-Ohio-864, ¶ 12.

{¶48} Nevertheless, because we conclude that the traffic stop was unreasonable under the totality of the circumstances, Appellant's constitutional rights were violated. Therefore, the trial court erred to the extent that it denied Appellant's motion to suppress. Because we find merit in Appellant's first assignment of error, we decline to address Appellant's second assignment of error, which has become moot.

CONCLUSION

{¶49} We vacate Appellant's conviction, reverse the trial court's judgment to the extent that it denied Appellant's motion to suppress, and remand this matter to the trial court for further proceedings consistent with this opinion.

**CONVICTION VACATED, JUDGMENT REVERSED, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION**.

Abele, J., dissenting:

{¶50} I respectfully dissent. Although I concede that this case presents a difficult and close issue, I agree with the trial court's view that the officer who observed the appellant's alleged improper turn had a reasonable suspicion for the traffic stop, regardless of the officer's misunderstanding of the law or mistaken reference to the provisions of the Chillicothe city code of ordinances.

{¶51} I agree with the principal opinion that the existence of probable cause or reasonable suspicion depends on whether an objectively reasonable police officer would believe that, based upon the totality of the circumstances, a traffic violation has occurred. However, probable cause for a traffic stop may exist even if an officer may not fully understand the law that the driver allegedly violated. Thus, the fact that a driver could not be ultimately convicted of a traffic offense is not determinative of whether an officer acted reasonably in making the traffic stop. *State v. Cronin,* 1st Dist. Hamilton No. C100266, 2011-Ohio-1479.

{¶52} In the case sub judice, I agree with the trial court's conclusion that the officer acted reasonably under the circumstances in making the traffic stop, even though the appellant's actions may not have actually constituted a violation under the language of the city ordinances. Also, the

trial court apparently detected no improper conduct, or less than good faith effort on the part of the officer in their attempt to enforce traffic law and a perceived violation.

{¶53} Thus, based upon the foregoing reasons, I believe that we should overrule appellant's assignment of error and affirm the trial court's judgment.

# JUDGMENT ENTRY

It is ordered that the CONVICTION BE VACATED, THE JUDGMENT BE REVERSED, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  Costs assessed to Appellee.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J.:  Concurs in Judgment and Opinion.
Abele, J.:    Dissents with Dissenting Opinion.

For the Court,

BY:  _____
Matthew W. McFarland, Judge

**NOTICE TO COUNSEL:  Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**